UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------- x
                    :

DENISE BAEZ                    :               3:09 CV 1735 (JBA)
                    :

V.                      :
                    :

MICHAEL J. ASTRUE         :
COMMISSIONER OF SOCIAL SECURITY   :      DATE: JULY 8, 2010
                    :
-------------------------------------------------------- x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER AND ON DEFENDANT'S MOTION FOR ENTRY OF
JUDGMENT AND AMENDED MOTION FOR ENTRY OF JUDGMENT AND REMAND</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental Security Income ["SSI"].

<u>I.  ADMINISTRATIVE PROCEEDINGS</u>

On September 10, 2007, plaintiff Denise Baez filed her applications for DIB and SSI, alleging an inability to perform substantial gainful activity since March 1, 2007, due to "[m]ajor depression [with] suicidal thoughts, asthma, [high blood pressure] and high [cholesterol]."  (<u>See</u> Certified Transcript of Administrative Proceedings, dated December 16, 2009 ["Tr."] 126-37; <u>see</u> Tr. 142-54, 166-68).  Plaintiff's claim for DIB was denied initially and upon reconsideration.  (Tr. 60-61, 70-76, 77-79; <u>see</u> Tr. 169-76).  On May 7, 2008, a Federal Reviewing Officer denied plaintiff's claims.  (Tr. 62-69).  Plaintiff was represented by counsel.  (Tr. 26, 56, 96).  On June 13, 2008, plaintiff requested a hearing, which hearing was convened before ALJ William Musseman on March 17, 2009.  (<u>See</u> Tr. 56-59, 80-95).  On that day, the ALJ recessed the hearing until June 12, 2009,

noting that counsel was not timely notified of the date, time and location of the hearing. (Tr. 58; see Tr. 97-99).  On June 12, 2009, plaintiff and her case manager, Leslie Denise Ferrier, testified at a hearing before ALJ Musseman; defendant's vocational expert, Renee B. Jubrey, was in attendance. (Tr. 26-55; see Tr. 100-20).[1]  On June 25, 2009, ALJ Musseman issued a partially favorable decision, which the Decision Review Board selected for review.  (Tr. 9-25).  On July 1, 2009, plaintiff's counsel filed her objection to the June 25, 2009 decision of the ALJ.  (Tr. 4-8).  Thereafter, on October 7, 2009, the Decision Review Board issued its notice that it did not act within the ninety day time frame, thus rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

Plaintiff filed her Complaint on October 27, 2009 (Dkt. #3),[2] in response to which defendant filed his Answer on January 6, 2010. (Dkt. #8).[3]  Thereafter, on February 8, 2010, plaintiff filed her Motion for Order Reversing the Decision of the Commissioner, and brief in support.  (Dkts. ##9-10).  On March 23, 2010, defendant filed an Amended Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. § 405(g).  (Dkt. #14; see Dkts. ##11-13).[4]  The next day, plaintiff filed her objection to defendant's Motion for Judgment, and on March 25, 2010, plaintiff filed her objection to defendant's Amended Motion for Remand.  (Dkts. ##15-16).  On April 5, 2010, defendant filed his response to plaintiff's

---

[1]On June 9, 2009, plaintiff requested that the ALJ grant her Title II and XVI applications based upon the record.  (See Tr. 121-25).

[2]Plaintiff commenced this action in forma pauperis on October 22, 2009. (Dkts. ##1-2).

[3]Attached to defendant's Answer is a certified copy of the transcript of the record, dated December 16, 2009.  There is a significant amount of duplication of medical records for some of the medical care providers in the administrative record.  See note 9 infra.

[4]Initially, defendant filed an Assented to Motion for Entry of Judgment (Dkt. #13), which Motion was Amended to reflect that plaintiff does not consent to an order reversing the decision of the Commissioner and remanding the case for further action.  (Dkt. #14).

objection.  (Dkt. #17).  On November 3, 2009, United States District Judge Janet Bond Arterton referred this case to this Magistrate Judge.  (Dkt. #5).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #9) is <u>granted</u>; defendant's Assented to Motion for Entry of Judgment (Dkt. #13) is <u>denied as moot</u>; and defendant's Amended Motion for Entry of Judgment and Remand of the Matter to the Commissioner of Social Security (Dkt. #14) is <u>denied</u>.

## II. FACTUAL BACKGROUND

Plaintiff presently is forty-six years old. (Tr. 126).  She lives alone (Tr. 127), and she is twice divorced with four sons. (Tr. 220; <u>but see</u> Tr. 134 (listing three children); Tr. 322 (listing five children)).  Plaintiff graduated high school in Puerto Rico and completed two years of training to earn her Certified Nurse Assistant ["CNA"] degree.  (Tr. 220; see Tr. 29-30, 149).[5]  At the time of her hearing, plaintiff was living in a shelter, although prior to that, she was homeless and living in a basement with rats and garbage.  (Tr. 34-35).

Plaintiff alleges she is disabled due to a "depression, anxiety, insomnia, and nightmares."  (Tr. 430,   530).  According to plaintiff, she has trouble concentrating, sleeping and remembering things, she "tend[s] to cry a great deal," she has difficulty completing things that she starts, and she is "extremely uncomfortable being around others." (Tr. 143; <u>see also</u> Tr. 153, 207).  Plaintiff reports that she is "constantly thinking about suicide." (Tr. 143).

On an average day, plaintiff dresses herself and bathes and washes her hair when she has an appointment "sometimes," or once a week.  (Tr. 178, 206).  Plaintiff

---

[5]However, on her supplemental application, plaintiff reports grade 12 as the highest level of school she completed.  (Tr. 434).

needs reminders to take care of personal needs and grooming, and she needs to be reminded to take her medicine. (Tr. 179). She does not prepare her own meals, shop or pay bills, and she does not do household chores on her own. (Id.). Plaintiff cannot drive a car; she walks to get from one place to another. (Tr. 431-32, 532, 664-65, 703-04). She claims that she needs help shopping for food and doing laundry. (Tr. 179-80, 433, 666, 705). She regularly watches television, listens to music, walks, and talks on the phone, but has "[m]any problems" paying attention, learning new things, remembering, organizing, reading, and going outside. (Id.; see also Tr. 143, 182, 697). According to plaintiff, she "lost [the] ability to" talk, hear, complete tasks, remember, concentrate, understand and follow instructions, and she does not handle stress well. (Tr. 182-83). She believes that her depression gets in the way of maintaining friendships (Tr. 637), so she does not participate in any social activities. (Tr. 182).

Plaintiff worked as a CNA in 1990, 2004, and 2006-07 (see Tr. 140-41, 144). As a CNA, plaintiff helped bath, dress and feed patients; she stood and stooped for one hour in the workday, and she sat for six hours. (Tr. 144). The most weight she had to lift was fifty to one hundred pounds. (Tr. 30, 145). Prior to 2006, plaintiff worked for an asbestos company for about six months in 2000 (Tr. 144; see Tr. 140); she worked as a cashier in a fast food restaurant for six months in 1992-93; she worked as a machine operator at a factory for four months in 1988; and she worked as a packer at a warehouse for six months in 1987. (Tr. 144).[6] Plaintiff describes the job that she did the longest as "computer" and states that in this job, she stood and walked for one hour, and sat for six hours. (Tr. 435, 690, 708; see also Tr. 31). She lifted less than ten pounds. (Id.).

---

[6]In a Work History Report, dated February 14, 2008, plaintiff wrote "I can't remember[ ]," in response to every inquiry. (See Tr. 185-92).

4

Plaintiff reports that she was laid off from her last job, but "[n]ow [she] feel[s] that [she] cannot find work due to [her] conditions." (Tr. 143).   According to plaintiff, she attempted to work for six weeks, but was out about fifteen times so she was let go. (Tr. 175).  At her hearing, plaintiff testified that she has always had attendance problems, and she has short term memory problems, both of which would affect her ability to work. (Tr. 32-33).

Plaintiff takes or has taken Neurontin, Wellbutrin, Klonopin, Cymbalta (Tr. 213-14, 245, 279, 322, 693, 722),[7] Elavil[8] (Tr. 214, 228, 693), Seroquel, Paxil (Tr. 228, 693), Altenolol, Lisinopril (Tr. 302), Proventil, Albuterol, Advair, Hydrochlorothiazide (Tr. 322, 607), Zyrtec, Singlulair, and Inderal. (Tr. 607).  Plaintiff reports that her medications make her "tired and dizzy[,]" and she has "trouble functioning" as a result.  (Tr. 143).

Plaintiff's medical records begin on September 16, 2004, when she was treated at the Capital Region Mental Health Center ["CRMHC"][9] for treatment of major depression, recurrent, severe.  (Tr. 214-38, 257-76, 451-70, 682-89, 724-33).[10]  Practitioner Cheryl Wetterauer found that plaintiff had a history of assaultive thoughts or behavior, a history of suicidal attempts of gestures, and a history of self-injurious behavior.  (Tr. 214-15, 277-78).  Her symptoms had worsened as plaintiff was off her medication for two months and

---

[7]See also Tr. 503-18.

[8]Plaintiff reported that she overdosed on Elavil more than fifteen or nineteen years ago. (See id., 223, 733).

[9]The CRMHC records are duplicated throughout the transcript.  (See Tr. 214-301, 412-29, 472-520, 682-701, 724-33, 792-994).

[10]Plaintiff reported a history of physical, mental and sexual abuse.  (Tr. 267, 694). Additionally, plaintiff reported that fourteen years ago, she abused drugs and served a five month sentence for possession of heroin. (Tr. 685, 730; see Tr. 733).   Plaintiff also reported to previous assault charges in February 2003.  (See Tr. 685, 730).

she was recently divorced, and custody of her two minor children was given to the children's father. (Tr. 218, 257; see Tr. 216).  An extensive psychosocial survey form was completed by plaintiff, and she was diagnosed with "M[ajor] D[epressive] D[isorder], moderate, recurrent" and assigned a GAF score of 42.  (Tr. 237, 275, 701).

On January 30, 2006, plaintiff reported to the emergency room at  Hartford Hospital with complaints of chest pain.  (Tr. 354-60; see Tr. 369, 777-83).  Records indicate that the pain was stress-related, as plaintiff was "very upset [and] [was] crying," and thereafter she developed chest pressure. (Tr. 354, 777).  By 7:00 p.m., the pain resolved and plaintiff was released.  (Tr. 358, 781).[11]  Plaintiff was treated for hypertension at St. Francis Hospital on March 13, 2007.  (Tr. 1045-53).

On April 9, 2007, plaintiff reported to CRMHC as "tearful," due to an incident two weeks prior in which she was arrested for risk of injury to a minor.  (Tr. 255-56).  Plaintiff reported that her chronic depression was the reason she did not have primary custody of two of her children, and her goal with her treatment was to get her children back.  (Id.).  Six days later, plaintiff underwent a Functional Assessment at CRMHC in which her psychiatric functioning was noted as a "[m]oderate impairment."  (Tr. 287-89).  At the time, she was "working with EARN to find employment."  (Tr. 287).  Plaintiff had no impairment with regard to her adult living skills, but a mild impairment in her interpersonal and social skills, and a moderate impairment in her leisure skills and her use of community resources.  (Tr. 288).

_____

[11]Plaintiff underwent a pharmacological stress test on July 24, 2008 which revealed no angina, atypical chest pain, or dyspnea during the test. (Tr. 366-68, 789-91).

On August 28, 2006, plaintiff was treated at the emergency room of St. Francis Hospital for acute laryngitis.  (Tr. 1054-63).

On May 3, 2007, plaintiff reported to CRMHC with "tearfulness, sobbing, c[omplaints] o[f] depression w[ith] suicidal ideation"; she "thought of overdosing on heroin . . . but [she] called clinic instead and thought of the legacy she would leave her children if she followed through."  (Tr. 253).   She had "generalized body aches, anhedonia, and anergia . . . . She has been unable to work in several months and ha[d] been chronically anxious and most recently depressed w[ith] suicidal ideation." (Tr. 253-54).

The same day, she presented to the emergency department of Hartford Hospital with suicidal thoughts and plans to overdose on heroin.  (Tr. 350-53, 370-72, 392, 754-756).  Plaintiff was admitted to the Institute of Living.  (See Tr. 353, 374-91; see also Tr. 757-76).   Plaintiff was "anergic, anhedonic, [and] tearful" with suicidal ideations: plaintiff described a plan to overdose on heroin, noting "that's the best way to go."  (Tr. 375, 758).[12]   Plaintiff's mood was "not good," and her affect was "sad, depressed, [and] tearful."  (Tr. 380, 763).   She was diagnosed with major depressive disorder, severe, recurrent, without psychotic features, and polysubstance dependence, in remission.  (Tr. 382, 765). Plaintiff had suicide ideation with a plan and access, poor judgment and insight, and limited impulse control.  (Id., see Tr. 381, 764).  Progress notes dated the next day, May 4, 2007, indicate that plaintiff "den[ied] current s[uicide] i[deation]," but reported "[increased] anxiety, [and] body aches." (Tr. 353).  The next day, plaintiff demonstrated "[no] anxious, agitated behaviors."  (Id.).

When plaintiff was seen for medication management on May 7, 2007 at CRMHC, plaintiff "report[ed] no suicidal ideation, [she was] not sobbing, [her] eyes [were] glassy,

------

[12]Plaintiff reported that her father committed suicide fourteen years prior by shooting himself.  (Tr. 376, 759).

[and there was] some staring, [and] prolonged time to re[sp]ond.  She [was] grossly anergic, . . . sad, mildly tearful and dysphoric."  (Tr. 251; see also Tr. 252).  Plaintiff's Cymbalta was increased and her Wellbutrin was decreased, and she was taking Klonopin as well.  (Tr. 251).  As of June 4, 2007, plaintiff was "brighter, mildly te[ar]ful at times, though . . . she [was] crying less, [and] feeling more ready to work."  (Tr. 249).

On July 16, 2007, a Master Treatment Plan was created at CRMHC to address stabilizing plaintiff's depressive symptoms evidenced by sadness, tearfulness, difficulty concentrating, problems with sleep, lack of energy and motivation and poor self-esteem. (Tr. 239-44, 585-90, 811-16).[13]  The goal of the plan was to return plaintiff to work.  (Tr. 239, 585, 811).  Four days later, CRMHC tried to engage plaintiff in the medication management program by telephone, but Dinorah Rijos, a social worker, was unable to reach plaintiff.  (Tr. 502, 927).

On August 9, 2007, Carole Montano at CRMHC noted that plaintiff was suffering from increased worry, difficulty falling asleep, and dysphoria.  (Tr. 216-17, 247-48, 298-99, 499-500, 924-25).  Plaintiff was "dysphoric and t[]earful throughout much of the session." (Tr. 216, 247, 298, 499, 924).  Plaintiff had applied to work at UPS, and planned to stop at the unemployment office on the way home from the appointment, but plaintiff was "clear that she [did] not wish to return to work as a CNA at this time." (Id.).  That same day, plaintiff had a medication management appointment by telephone, which she

_____

[13]This Treatment Plan was addressed on October 15, 2007 (Tr.806-10), February 7, 2008 (Tr. 281-86, 573-78), and May 8, 2008 (Tr. 566-70), at which time it is noted that plaintiff "continues to struggle with her chronic depression and episode of anxiety."  (Tr. 569).

missed.  (Tr. 501).  Plaintiff was seen for individual counseling on August 29, 2007 with Cecilia Rivera. (Tr. 498).[14]

On September 5, 2007, plaintiff saw Dianne Ryan at CRMHC for medication management, who noted that plaintiff attended group therapy. (Tr. 216, 496).  "Her attitude [was] very positive about the group and she [was] hopeful that it [would] help her to better regulate her emotions and [stabilize] her mood.  Her mood [was] upbeat today – she ha[d] engaged easily with the group and [felt] it [was] a good fit for her." (Tr. 216, 496; see Tr. 497).[15]

In a Disability Report - Appeal, dated on or after September 10, 2007, plaintiff reported that she was getting more anxiety attacks, was more depressed and felt "more suicidal."  (See Tr. 202).  Plaintiff reported that she forgot things quickly and could not focus or concentrate.  (Id.).  Additionally, she complained of low back pain that hurt all the time, "but especially when [she is] bending."  (Id.).[16]

---

[14]On August 29, 2007, plaintiff started individual counseling sessions through CRMHC, for her increased symptoms of depression which was causing her to cry "most of the time during the meeting." (Tr. 498, 923).  She attended individual therapy sessions on September 5 and 12 (Tr. 495, 497), and December 12, 20 and 27, 2007, when Olga Ruiz noted that plaintiff continued to be depressed and complained of sleep disturbances (Tr. 419-20, 424-25, 888-89, 893).  Plaintiff attended individual sessions on January 7, February 15 and 20, 2008, when plaintiff reported to Ruiz that she continues to struggle with her depression; she also participated in individual counseling on April 16 and July 2, 17, and 25, 2008, and March 13 and 25, 2009 (see Tr. 415-16, 534, 544, 556, 558, 820-21, 826-27, 845, 855, 867, 869, 876-77, 984, 987).

[15]On September 5, 12, November 14, 21, 27, and December 12, 2007, January 2, 9,23, February 20, 27, March 5, 26, April 9, 16, 23, 30, May 7, 14, 21, and June 11, 2008, plaintiff participated in group therapy sessions at CRMHC.  (Tr. 413-14, 418, 425, 476, 496, 480, 536, 539-43, 545-47, 550, 553, 555, 557, 847, 850-54, 856-57, 861, 864, 866, 868, 874-75, 886-87, 894, 903, 907, 922, 927-28).

[16]There is an undated MRI record in the transcript. Plaintiff had a lumbar MRI without contrast at Connecticut Valley Radiology, P.C.  (Tr. 995).  The results revealed that in  L4-L5 there was a loss of T2 disc signal with disc osteophyte complex and diffuse disc bulge causing mild spinal stenosis.  (Id.).  The diagnostic impression was disc degeneration and mild spinal stenosis L4-L5 without focal abnormality or disc extrusion.  (Id.).

On September 12, 2007, Marcy Fanello at CRMHC, who saw plaintiff for a general psychiatric visit, noted that plaintiff completed a therapy group entitled "Developing Ways to Feel Better: Self-soothing."  (Tr. 215-16, 495).  Two days later, practitioner Dianne Ryan noted that she discussed with plaintiff "the importance of continuing treatment, especially if she hopes to be successful in meeting her educational and employment goals." (Tr. 215, 494, 921).[17]

Plaintiff had an appointment with Dianne Ryan at CRMHC on October 4, 2007, at which she stated she was "better," she had been taking her medication regularly and was "less depressed," and she stopped her school program so she was "less stressed."  (Tr. 489, 916). Her only complaint was sleep disturbance; she was having trouble both falling asleep and staying asleep. (Id.).[18]

On October 10, 2007, Jerrold Goodman, PhD. completed a Mental Residual Functional Capacity Assessment of plaintiff for SSA. (Tr. 303-06).  According to Dr. Goodman, plaintiff was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to

_____

[17]She missed her appointments on September 14 and 26, October 3, November 28, and December 19, 2007, February 1 and 6, March 19, April 2, May 21, June 18-19, July 9, 16, 23, and 30, and October 31, 2008, and February 2, 2009 (Tr. 412, 421, 473, 491-92, 535, 538, 551-52, 559, 592-93, 597, 603, 605, 818-19, 823, 829, 831, 846, 849, 858, 862-63, 870, 873, 890, 900, 918-19, 946, 981, 988-94).

[18]Plaintiff missed a second appointment that day at CRMHC.  (See Tr. 490, 917).

10

interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticisms from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; be aware of normal hazards and to take appropriate precautions; and to travel in unfamiliar places or use public transportation.  (Tr. 303-04).  However, plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, maintain concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to set realistic goals or make plans independently of others.  (Id.).

Dr. Goodman noted that plaintiff's allegation of depression was "credible given her history and current treatment. However, as recently as . . . [September 14, 2007,] she was seen as having only minor mental health difficulties."  (Tr. 305; see also Tr. 319).  He also noted that her social skills were intact, and she would benefit from assistance in setting realistic goals given her history of poor judgment.   (Id.).

In Dr. Goodman's Psychiatric Review Technique, also dated October 10, 2007,[19] he noted that an RFC Assessment was necessary, and he indicated that his report was based upon a medically determinable affective disorder that did not precisely satisfy the

---

[19]From October 3, 2007 to October 24, 2007, Angel Rangel of CT Disability Determination Services ["DDS"] contacted plaintiff four times for updated medical information.  (See Tr. 156-59).  On October 24, 2007, plaintiff reported that she did not have any prescriptions for the past three months, and that she last saw Dr. Rodriguez six months prior.  (Tr. 159).  Plaintiff was informed that CT DDS would request a consultative examination.  (Id.).

criteria on the form: "Major Depressive Disorder, recurrent per TP." (Tr. 307-20).   This

disorder mildly limited plaintiff's activities of daily living and her ability to maintain social

functioning;   and   moderately   affected   plaintiff's   ability   to   maintain   concentration,

persistence, or pace.  (Tr. 317).[20]

On   October   16,   2007,   plaintiff   presented   to   Montano   for   medication

management; again she was tearful, and she reported that she stopped attending various

programs because she could not concentrate.  (Tr. 296-97, 486-87, 913-15).  She had also

lost fourteen pounds since her last visit, and reported a decrease in her appetite.  (Id.)

Her blood pressure was recorded as 176/110, and Montano encouraged her to go as a

walk-in to Bergdorf Clinic at Saint Francis Hospital (id.), which she did.  (Tr. 321; see Tr.

482, 909).[21]

On   November   14,   2007,   plaintiff   underwent   a   consultative   examination   by   Dr.

Kathleen Mueller for Connecticut Disability Determination Services ["DDS"].   (Tr. 322-24,

325-29).  Dr. Mueller noted that plaintiff's anxiety and depression began when she was

eleven years old; all of her hair fell out as a physiological reaction to stress.  (Tr. 322,

325).  This symptom recurred when plaintiff was nineteen years old.  (Id.).   Plaintiff

_____

[20] However, the evidence did not establish that plaintiff experienced any "C" criteria.  (Tr. 318).

[21]Plaintiff was seen for a follow-up visit for her hypertension on March 23, 2007, in which record it was noted that plaintiff lost her job.  (Tr. 302).   Plaintiff was diagnosed with "H[yper]T[ensio]N-- poorly controlled, [d]epression, and [p]sycho-social stress."  (Id.).  The notes also indicated that plaintiff wanted to change her medication because she was suffering increased depression symptoms with Atenolol; the practitioner prescribed Lisinopril instead. (Id.).

Also on this day, Dr. Deackoff completed a physical status report on plaintiff in which she noted no abnormalities with plaintiff's facial and oral movements, extremity movements, trunk movements, global judgment or dental status. (Tr. 520).

Plaintiff placed telephone calls to CRMHC on October 17 and 18, 2007 to discuss her housing situation.  (Tr. 910-12).

reported that she "feels that her anxiety and her depression have led to her losing her job," and that she had to leave her nursing assistant position because she "had so much anxiety [that] she was unable to do her job . . . ." (Id.).  The report also indicated that plaintiff was an hour late for her appointment, and that she was "occasionally tearful" during the discussion, and had "somewhat vague answers to many of the questions."  (Tr. 323, 326).  Dr. Mueller noted that there were "[s]ome objective signs of depression."  (Tr. 324, 328).

Plaintiff was also seen as a walk-in patient at CRMHC on this date.  (Tr. 481).  Plaintiff complained of "mood lab[i]lity with periods of increased weepiness, isolation, hopelessness."  (Id.).  Two days later, Dr. Virginia Rittner completed a Case Analysis for SSA in which she relied on Dr. Mueller's examination to conclude "M[edical] E[vidence] [of] R[ecord] identifies hypertension but not E[nd] O[rgan] D[amage].  Agree medically N[on] S[evere] I[mpairment]."  (Tr. 330).

On November 19, 2007, plaintiff presented to her medication management appointment with Montano, as "tearful, complaining of a headache of several days duration," and complaining of a recent nightmare involving her history of abuse.  (Tr. 294-95, 478-79).  Her blood pressure was recorded as "dangerously el[e]vated at 180/120 . . . [t]his type of reading has been quite usual for her."  (Id.).   On that same day, Carly Nasser of DDS completed a vocational analysis of plaintiff in which she concluded that based on the medical evidence in the file, plaintiff had a "severe mental impairment," but no severe physical impairments.  (Tr. 165).  Plaintiff was able to handle simple tasks but her symptoms could compromise her ability to handle detailed tasks of extended duration on an occasional basis.  (Id.).  Nasser concluded that plaintiff was able to work around

13

others, and adapt to change, though she could "have occasional problems establishing realistic plans and goals." (Id.).  According to Nasser, plaintiff could not be expected to perform her last work as a CNA, but she could perform other work such as: Surveillance System Monitor; Folder, Laundry; and Packer.  (Id.).

On November 29, 2007, plaintiff arrived for medication management with Montano, "again tearful and anxious, shaking her legs, wearing her jacket up over her as if it [was] a blanket.  She relate[d] in a dysphoric manner, a childlike manner, in need of guidance and direction. . . ." (Tr. 292-93, 427-28).[22] Montano spoke with plaintiff regarding the relationship between untreated hypertension and psychiatric symptoms. (Id.). Plaintiff reported that she was working at a JC Penney Warehouse.  (Id..) Montano noted a diagnosis of anxiety.  (Tr. 213).

In her Disability Report - Appeal, dated after November 2007, plaintiff reported that circumstances had gotten worse. (Tr. 170).  She became nervous around people, was claustrophobic, and she experienced anxiety attacks and suicidal thoughts.  (Id.). Additionally, she reported that she fell while in the hospital the week before and now she experienced pain in her back.  (Id.).   According to plaintiff, when she was depressed, she did not cook or bathe, but instead stayed in her friend's basement.  (Tr. 174).

On November 14, 2007, plaintiff met with Dianne Ryan at CRMHC, during which appointment plaintiff complained of mood lability with periods of increased weepiness, isolation and hopelessness.  (Tr. 908). Five days later, on November 19, 2007, plaintiff

---

[22]The day before, plaintiff did not attend her group therapy session but that session did not take place anyway because of a fire alarm.  (Tr. 473; see also Tr. 472; see also notes 17-18 supra).  When she was contacted by CRMHC, plaintiff reported that she was feeling very depressed, was having a lot of anxiety attacks, and was only able to sleep one-to-two hours a night.  (Tr. 474-75).  She was experiencing suicidal ideations and thoughts.  (Id.).

met with Ryan again at CRMHC.  (Tr. 477, 904).  Plaintiff arrived twenty minutes late for her appointment, and she was "poorly groomed with messy hair and wrinkled clothing and [she began] to weep as soon as she enter[ed] [Ryan's] office."  (Id.).  On that same day, when plaintiff met with Montano for medication management, she was "tearful," she reported recent nightmares and erratic sleep, she was "anergic and anhedonic," and she had "baseline chronic passive suicidal ideation."  (Tr. 478-79, 905-06).  Ten days later, plaintiff was seen by Montano for medication management, during which appointment plaintiff was "dysphoric," and in need of guidance and direction, and she had slurred speech.  (Tr. 427-28, 896-97).  Plaintiff was taking Wellbutrin, Neurontin, Cymbalta and Klonopin; she doubled the Klonopin because she was unable to sleep.  (Id.).

On November 28, 2007, plaintiff reported to Dinorah Rijos at CRMHC that she was not feeling well; she was "very depressed," she was experiencing difficulty sleeping, and she was experiencing suicidal thoughts and ideations.  (Tr. 901-02).  Plaintiff expressed a suicidal plan and intent.  (Tr. 902).

Plaintiff complained of depression at CRMHC on December 12, 2007 (Tr. 424), and eight days later, plaintiff met with Cheryl Laporte, M.S.W., R.N., at CRMHC, after "sleeping all day" the previous day.   (Tr. 420).  She was "tearful during this session, spoke about feeling helpless and being overwhelmed by 'all' her current stressor[s], which include[d] having no money, job, and [being] homeless and not being able to have custody of her children."  (Id.).  On December 17, 2007, Montano noted that plaintiff had a significant impairment and she required further evaluation.  (See Tr. 422-23). Plaintiff met with Olga Ruiz of CRMHC ten days later. (Tr. 419).  At this appointment, plaintiff was

depressed, complained of sleep disturbances, and she expressed her need to obtain entitlements, as she was homeless.  (Id.).

Plaintiff was treated at the Hartford Hospital emergency room on January 4, 2008 after she "created a scene [at] a local Walmart because 'Walmart took too long to give [her her] blood pressure medicine.'"  (Tr. 331; see Tr. 331-42, 373, 411, 734-35).  She was treated for anxiety and given Klonopin.  (Tr. 331, 734).  While at the hospital, plaintiff underwent a psychiatric evaluation with The Institute of Living ["IOL"] during which she was "[h]ysterical," "tearful" and "extremely dramatic" in describing the Walmart incident.  (Tr. 334-35, 339; see Tr. 396-410, 736-53).  Her psychiatric intake form revealed a history of suicidal ideation, suicide attempts, and self-injurious behavior (Tr. 335, 395, 738), as well as "[t]earful, [o]verly productive speech" and behavior described as "[h]istrionic, [s]haking."  (Tr. 339, 399, 742).  Plaintiff exhibited poor judgment, impulse control, and insight, and she was awarded a GAF score of 47.  (Tr. 341, 401, 744).  She was diagnosed with major depressive disorder, recurrent, severe without psychotic features, anxiety disorder NOS, and personality disorder NOS.  (Tr. 341, 401).   Plaintiff was discharged the same day.  (Tr. 334, 394; see Tr. 417).

On February 1, 2008, plaintiff met with Dr. Nancy Deackoff of CRMHC for her complaints of depression and anxiety:

> She report[ed] many situations make her anxious.  She is very anxious and uncomfortable around people and crowds.  She is anxious and almost always has a feeling of dark dread in the back of her mind that something dreadful and bad is going to happen.  She has frequent feelings of just wanting to be dead and get away from all the pain – at those times when she feels suicidal, she holds to the thought that she cannot do this to her children and it does pass.  She also reports a lot of physical symptoms of pain – chest feels tight, gets intolerable headaches, her muscles ache when she is feeling bad.  She often wakes up abruptly from her sleep at night frightened, shaking, sweating,

> feeling like she is back in the old scary situations.  She find[s] that she is anxious and tries to avoid situations that might make her uncomfortable.  She finds that she is easily startled and always on guard, etc.
>
> Reviewed with patient that in addition to her depression she would appear to have what we call PTSD [(post-traumatic stress disorder)]. . . .

(Tr. 279-80, 290-91, 560-61, 871-72).[23]   Dr. Deackoff diagnosed plaintiff with PTSD, chronic, with delayed onset, with a principal diagnosis of major depressive disorder, recurrent, severe without psychotic features.  (Tr. 572, 799, 872).   She had a GAF of 45.  (See Tr. 577, 799).  Six days later, plaintiff's Master Treatment Plan was updated at which time her diagnoses were major depression, recurrent, severe, and PTSD.  (Tr. 803; see Tr. 800-05).

Dr. Deackoff completed a medical report for plaintiff on February 27, 2008, in which she opined that plaintiff's PTSD and major depression disorder prevented plaintiff from working.  (Tr. 440-47, 671-78, 712-19).   According to Dr. Deackoff, plaintiff "has been diagnosed with post traumatic stress disorder, in which she experiences uncontrollable crying spells, [increased] anxiety, [and] sleep problems. [She] also has problem[s] with memory, low self esteem and lack of energy.  She also isolates from others and panic[s] at certain situations which trigger her symptoms."  (Tr. 440, 671, 712).  Dr. Deackoff expected that plaintiff would be unable to work for twelve months or more. (Id.).   Additionally, Dr. Deackoff reiterated that plaintiff had been in treatment for depression with "symptoms worsening in the last two years," and she had memory

---

[23]On February 7, 2008, plaintiff's Master Treatment Plan was reviewed, in which it was noted that plaintiff had not achieved the goal of managing her symptoms, she continued to struggle with symptoms of depression, and she was not consistent with treatment compliance.  (Tr. 281-86; see also Tr. 415-16).

problems, increased anxiety, decreased ability to sleep, and crying spells.  (Tr. 443, 674, 715).

According to Dr. Deackoff, plaintiff was moderately limited in her ability to remember locations and work-like procedures, understand, and remember short and simple instructions, understand and remember detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation.  (Tr. 444-45, 675-76, 716-17).

Plaintiff was markedly limited in her ability to carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others.  (Id.).  Dr. Deackoff noted that plaintiff was in weekly group and individual therapy programs, and

that she had a history of three inpatient treatments for depression and suicidal ideation, in 1996, 2003, and 2008.  (Tr. 446, 677, 718).[24]

That same day, plaintiff completed her supplemental application for Medicaid and SAGA benefits from Connecticut Department of Social Services in which plaintiff noted that she suffered from depression, anxiety, insomnia and nightmares, all of which had gotten worse, and that she "[could] not be dependable [at work] because [of her] sleep problems." (Tr. 430-31, 530-31, 663-64, 702-03; see Tr. 430-39, 530-33, 663-70, 702-09). At the time, plaintiff was homeless.  (Tr. 431, 664, 703).  Plaintiff reported that she "[s]ometimes" had problems sitting, standing, walking, bending, lifting, grasping, pushing and pulling, and that she needed help shopping for food and doing laundry.  (Tr. 433, 666, 705).  Additionally, according to plaintiff she had "[m]any problems" paying attention, learning new things, remembering, organizing, and reading because she could not concentrate.  (Id.).  Plaintiff also reported that she became anxious when she went outside.  (Id.). She watched television, listened to music, walked, and talked on the phone.  (Id.).

On April 1, 2008, plaintiff was seen by Dr. Deackoff for a scheduled office visit; plaintiff's diagnosis was changed to post-traumatic stress disorder, chronic, with delayed onset, with a principal diagnosis of major depressive disorder, recurrent, severe without psychotic features.  (Tr. 548-49, 571, 798; see also Tr. 859-60).  Dr. Deackoff noted that plaintiff's "anxiety [was] better over the last month or so since she started taking the Neurontin . . . . She [was] still dealing with nightmares, [and] flashbacks."  (Tr. 548, 849).

---

[24]Dr. Deackoff also completed a physical status report on plaintiff in which she noted no abnormalities with plaintiff's facial and oral movements, extremity movements, trunk movements, global judgment or dental status. (Tr. 519, 944).

Dr. Deackoff noted that "Prazosin . . . has found to be helpful for veterans with nightmares and PTSD," but also noted that plaintiff's insurance was unlikely to pay for it. (Id.).  Dr. Deackoff also completed a Risk Assessment for plaintiff on this date, in which she stated that plaintiff had the following risk factors: history of assaultive thoughts or behavior, history of suicidal attempts or gestures, history of self-injurious behavior, current other stressors or anniversaries, and current medical issues.  (Tr. 610-12, 881-83).  On April 16, 2008, a Functional Assessment of plaintiff was completed in which plaintiff was rated to have a moderate impairment in psychiatric function and coping skills.  (See Tr. 835-36).

On April 21, 2008, Dr. Sabah Hadi, a board certified psychiatrist, completed a case analysis of plaintiff for SSA in which she noted that plaintiff's allegations of "major depression with suicidal thought and multiple medical problems" were credible. (Tr. 345). According to Dr. Hadi, plaintiff was mildly impaired in her ability to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, and interact appropriately with supervisors and coworkers. (Tr. 346-47).  She was moderately impaired in her ability to understand, remember and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, and respond appropriately to usual work situations and to changes in a routine work setting. (Id.).  Dr. Hadi concluded that plaintiff had major depression disorder and PTSD, severe, but her impairments did not meet or equal the Listings.  (Tr. 345).

Eight days later, Dr. H. Bronstein completed a case analysis of plaintiff for SSA, in which he indicated that plaintiff's hypertension and asthma were non-severe impairments, and her hypercholestemia was not an impairment.  (Tr. 349).  The next week, on May 8,

20

2008, plaintiff's Master Treatment Plan at CRMHC was reevaluated. (Tr. 793-97).   Plaintiff continued to struggle with her chronic depression and episodes of anxiety.  (Tr. 796).  Her principal diagnosis was PTSD, and she was assigned a GAF of 45.  (Tr. 797).

Plaintiff was seen by Dr. Deackoff on July 3, 2008 for a quarterly evaluation. (Tr. 606-07; see also Tr. 832-33). Plaintiff's admitting diagnoses were PTSD, chronic, with delayed onset, and major depressive disorder, recurrent, in partial remission.  (Tr. 564). Plaintiff was assigned a GAF of 50.  (Tr. 565, 607, 833).  At the time of the evaluation, plaintiff's depression was in partial remission.  (Tr. 606, 832). Six days later, plaintiff's Axis 1 diagnoses were changed; her principal diagnosis of major depressive disorder was replaced with PTSD, chronic, with delayed onset.  (Tr. 564).[25]

On July 17, 2008, Dr. Deackoff saw plaintiff who revealed that she had been having trouble sleeping and had been self-medicating with Klonopin; Dr. Deackoff agreed to prescribe more but noted that plaintiff would have to pay for it since insurance would not absorb an early refill. (Tr. 600-01; see Tr. 602, 604).   Dr. Deackoff also increased plaintiff's dosage of Cymbalta from 60 mg to 80 mg daily.  (Tr. 601).   On that same day, plaintiff reported to CRMHC "very tearful, hopeless, helpless, overwhelmed," and expressing suicidal ideation.  (Tr. 599).  Plaintiff had not slept in days and "was not able to complete [a] sentence without crying hysterically."  (Id.).

On July 18, 2008, plaintiff was admitted to IOL for ten days, after presenting to the emergency room at Hartford Hospital following a suicide attempt.  (Tr. 630-34, 996-99; see Tr. 362-68).   Prior to this incident, plaintiff had attempted to overdose three separate times in "recent weeks," and ten times in total during her life.  (Tr. 630, 996).

---

[25]Three additional "Change in Diagnosis" forms appear in plaintiff's file: one dated February 1, 2008 (Tr. 572), one dated April 1, 2008 (Tr. 571), and one dated August 4, 2008 (Tr. 613, 884).

She was "having problems falling asleep . . . not interested in anything, expressing anhedonia. She [was] unable to concentrate, even on television . . . . She seem[ed] slurred in the way she talk[ed] and somewhat slow in her speech. . . . She admit[ted] to auditory hallucinations of her deceased beloved ones who call her name." (Id.). Her GAF score was 25 upon admission. (Tr. 634, 999). Plaintiff was taking Clonazepam, Neurontin, Cymbalta, Wellbutrin, Lisinopril, and Hydroclorothiazide. (Tr. 631, 997). Following treatment, she was doing much better and deemed ready for discharge on July 28, 2008, with a GAF score of 42 and the following diagnoses: major depressive disorder, recurrent, severe, with psychotic features, PTSD, opioid dependence, in full remission, and borderline personality disorder. (Tr. 632, 634, 999).

During her stay at IOL, plaintiff underwent psychological testing on July 24, 25 and 28, 2008. (Tr. 635-40, 1000-05). Plaintiff was examined by Adrienne Lapidos, M.A.; Dr. Jennifer Ferrand was the supervising clinical psychiatrist and Dr. Tilla Russer was the attending psychiatrist. (Tr. 635, 640, 1000, 1005). While plaintiff denied psychotic symptoms upon intake, her symptoms "emerge[d] on the fourth day of her . . . hospitalization." (Tr. 635, 1000). Plaintiff experienced auditory hallucinations of someone calling her name and visual hallucinations of "shadows and a lady standing before her bed." (Tr. 636, 1001; see also Tr. 637, 1002). Plaintiff discussed the "severe" physical and emotional abuse she suffered at the hands of her mother, and the sexual abuse inflicted upon her by an older brother. (Id.).[26] She exhibited "the hallmark post-traumatic symptoms such as flashbacks; avoidance of noxious reminders of the past; physiological reactions to such cues; severe anxiety; and nightmares." (Id.). Plaintiff also "elaborated

---

[26]Plaintiff also discussed her history of substance abuse, but she had been clean for sixteen years, subsequent to a five month prison sentence for possession of heroin. (Tr. 637; see Tr. 636).

upon her history of perceptual distortions." (Id.).  During the course of her testing, plaintiff "consistently returned to morbid and supernatural topics without prompting." (Tr. 637, 1002).  In addition,

> There were strong indications that she endorsed items that portrayed her in an especially negative or pathological manner.  Though this magnification does not appear to be deliberate, and is likely to reflect a "cry for help," the PAI test results potentially involve significant distortions and are unlikely to reflect her objective clinical status.  The subjective clinical features she reported included anxiety, posttraumatic stress, depression, labile mood, self-destructive behaviors, magical thinking, unusual perceptual and sensory experiences and intense recurrent suicidal ideation . . . .
>
> While no gross evidence of psychosis emerged, the fact that excessive morbidity tainted almost every story can be conceptualized as a sign of poor reality testing. . . .
>
> Despite [plaintiff's] many psychological deficits, there [are] some indications that [she] shows an adaptive capacity for introspection and self-awareness.  She engaged quite willingly with all test procedures, and expressed interest in learning more about herself.  She also appears to be able to attach to mental health professionals.  Such traits are good prognostic indicators for success in psychotherapy.

(Tr. 638-40, 1003-05).

On July 25, 2008, Olga Ruiz met with plaintiff while she was an inpatient at IOL. (Tr. 594-95).  Plaintiff reported "feeling overwhelmed and 'had began to he[a]r voice[s] which at first she tr[ied] to ignore." (Tr. 594).  She also reported racing thoughts and "suicidal ideations off and on." (Id.).  Upon discharge, plaintiff's diagnoses were major depressive disorder, recurrent, severe, with psychotic features, PTSD, opioid dependence, in full remission, borderline personality disorder, asthma and hypertension.  (Tr. 634).

Five days later, on July 30, 2008, plaintiff was readmitted to IOL at Hartford Hospital, where she stayed until September 17, 2008.  (See Tr. 627-29, 1006-08).  Plaintiff's  chief complaint upon admission was that she was "having panic attacks" and

was "claustrophobic."   (Tr. 627,1006).  She reported symptoms including "lethargy, anhedonia, hopelessness, tearfulness, overwhelming anxiety, and some passive suicidal ideations."  (Id.).   She was treated with assessment group therapy, experiential group therapy, coping skills group therapy and medication review and management, four times a week.   (Id.).   She also underwent a sleep study, primary care appointments, and cardiology appointments.  (Tr. 628, 1007).  Upon discharge, plaintiff was diagnosed with major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; opiate dependence, in full remission; alcohol dependence, in full remission; cocaine dependence, in full remission; borderline personality disorder; back pain; hypercholesterolemia; and hypertension."  (Tr. 628-29, 1005-06).[27]

On September 9, 2008, plaintiff reported to Community Health Services seeking the results of her sleep study (Tr. 648; see also Tr. 647), and on September 24, plaintiff was diagnosed with sleep apnea.  (Tr. 646; see also Tr. 642).[28]  On October 6, 2008, plaintiff entered My Sisters' Place, Inc., a homeless shelter, where she stayed until

---

[27]On July 31, 2008, plaintiff was contacted by Olga Ruiz at CRMHC to return to treatment upon her discharge from IOL.  (Tr. 591, 817).  On August 1, 2008, Dr. Deackoff noted that plaintiff was discharged from IOL.  (Tr. 590, 816).

On August 4, 2008, plaintiff's Master Treatment Plan at CRMHC was updated.  (See Tr. 614-23, 885, 949-54).  At the time, plaintiff was assigned a GAF of 44.  (Tr. 620, 841, 953).

In a Report of Contact from SSA, dated August 6, 2008, plaintiff's hospitalization at IOL from July 23-28, 2008 for "[m]ental problems," for which plaintiff received individual and group therapy and medication, is noted. (Tr. 209-12).

[28]Plaintiff underwent a sleep study at St. Francis Hospital on September 19, 2008.  (See Tr. 1025-28).

December 1, 2008.  (See Tr. 1009-20, 1064-79).[29]  My Sister's Place provided plaintiff with case management services.  (See Tr. 35,1015, 1068).

A Master Treatment Plan was completed at CRMHC on November 4, 2008, in which plaintiff's inconsistent compliance with treatment was noted.  (See Tr. 955-60).  On November 21, 2008, plaintiff took part in a CPAP titration study through St. Francis Hospital to determine "optimal treatment parameters for treatment for sleep apnea." (See Tr. 1021-24).

On November 24, 2008, plaintiff picked up her refills of blood pressure medication; progress notes indicate her condition was "uncontrolled" on this date, but  her asthma was stable.  (Tr. 644).  Six days later, plaintiff was seen for a blood pressure check, at which time her chronic hypertension was noted.  (Tr. 651).  On December 30, 2008, plaintiff reported to Community Health Services for treatment relating to her arthritis pain, which she rated as an 8 on a scale of 1 to 10. (Tr. 641).  Records reflect that plaintiff showed disc bulge and spinal stenosis.  (Id.).

Dr. Deackoff saw plaintiff on January 12, 2009 for her quarterly evaluation, during which Dr. Deackoff noted that plaintiff was "[c]lear and focused," had organized thoughts, and had no suicidal thoughts, lability, irritability, evidence of mood, affective, or psychotic disturbances.   (Tr. 979-80).  On February 9, 2009, plaintiff saw Olga Ruiz and Dr. Deackoff, at which time she was in "no distress."  (Tr. 982-83).

On February 28, 2009, DSS determined that plaintiff was disabled under Title XIX and unemployable.  (Tr. 521; see also Tr. 523-29, 652-662).    Plaintiff met Title XIX

---

[29]There are additional medical records from October 10, 2008 from St. Francis Hospital relating to a fracture in plaintiff's finger, caused by a window falling on her fingers.    (See Tr. 1034-44).

criteria for PTSD with flashbacks of past abuse, and the following is noted in support of a disability determination: "[l]imited by [m]ajor [d]epression [with] sleep problems, [l]ow [s]elf-[e]steem [and] lack of [e]nergy.  Has marked limitations in ADLs, [c]oncentration [and] social functioning [d]ue to [s]ocial [i]solation.  Claimant has a [significant] [psychiatric history with] multiple [in-patient] hospitalizations." (Tr. 523, 659, 661).

On March 13, 2009, plaintiff was seen again by Dr. Deackoff, during which appointment they discussed the effectiveness of plaintiff's Paxil, Klonopin, Neurontin, Seroquel, and Vistaril.  (See Tr. 985-86).  One month later, on April 16, 2009, plaintiff underwent a Functional Assessment at CRMHC in which her "[p]rovider" noted moderate impairment in psychiatric and vocational functioning.  (See Tr. 967-70).  Two weeks later, on May 1, 2009, CRMHC issued a Master Treatment Plan in which plaintiff's inconsistent compliance with treatment was noted.  (See Tr. 971-78).

Plaintiff, vocational expert Renee Jubrey, and Leslie Ferrer, plaintiff's case manager, appeared at a hearing before ALJ Musseman on June 12, 2009.  (See Tr. 26-55). Plaintiff testified that she has tried to kill herself, "[p]robably more than ten" times, by cutting herself and taking more pills that she should; she tried to get a gun but she could not buy it because she "had a record."  (Tr. 38). Plaintiff further testified that she contemplates suicide "[e]veryday.'" (Id.).[30]  Plaintiff testified that she does not get along

---

[30]Plaintiff's father and all of his seven brothers and sisters committed suicide.  (Tr. 38-39). During the colloquy on the record, the ALJ dismissed a connection that plaintiff's counsel was trying to make between the history of suicide in plaintiff's family and plaintiff's PTSD diagnosis.  (Tr. 39). Specifically, the transcript reads:

ALJ: [A]re you trying to convince me that I need to find anybody who's lost relatives in the past has [PTSD]?

ATTY: Your Honor, I don't think it's your job to find that she has [PTSD.] . . . That's already in the record. . . .

with her psychiatrist at CRMHC because she "mak[es] fun" of plaintiff, she did not believe plaintiff when she told her that she could not sleep and that she was taking more pills, and then plaintiff "ended up" in the emergency room of Hartford Hospital.  (Tr. 42).

Plaintiff testified that she has been receiving psychiatric services since she was eleven years old, after she lost her hair from anxiety.  (Tr. 42-43).  Plaintiff was physically, emotionally, and sexually abused as a child. (Tr. 43-44).  Plaintiff's ex-husband has custody of her minor children because of plaintiff's history of depression and anxiety.  (Tr. 45).

According to plaintiff, she experiences anxiety, insomnia, sadness, suicidal thoughts, pain in her joints, irritability, mood swings, anger, and memory and concentration problems.  (Tr. 45).  Plaintiff testified that she hears voices of her father, grandmother, uncles and aunts, urging her to join them in "the other world" (Tr. 46-47), and there are times that she does not sleep at all because she has "racing thoughts."  (Tr. 47).  According to plaintiff, she has had anxiety attacks where she is crying and screaming, and she has assaulted her ex-husband's ex-wife and present wife; she has been arrested four times.  (Tr. 48-49).

As for her physical complaints, plaintiff testified that she is treated for a "slight disc [in her back] that has been pinching [her] nerves," for which she takes Ultracet and Flexeril, and she has sleep apnea.  (Tr. 50-51).  She can lift two pounds with one hand, and ten pounds with the other. (Tr. 51).  Her back and arm pain affect her ability to clean the house, go for walks, get dressed, and wash or comb her hair.  (Tr. 52).   Plaintiff also

---

ALJ:  Well, let's put a date and time on it.  If it's back when she was three years old, no, I ain't buying it.

(Tr. 39-40).

testified that she has headaches that sometimes last for a day.  (Tr. 53).  Plaintiff's case manager, Leslie Ferrier, testified that she has known plaintiff for about six months through her residence in a supportive housing program, and that in her opinion, plaintiff would have difficulty being able to "sustain herself if she did not reside in [that] program."  (Tr. 54).

On August 4, 2009, CRMHC completed another Master Treatment Plan of plaintiff in which a GAF of 50 is assigned, and it was noted that plaintiff "has remained stable . . . and has not needed inpatient level of care."  (Tr. 964; see Tr. 961-66).

## III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.   See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).   Instead, the court must scrutinize the entire record to determine the

reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See  20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).  If the claimant shows he cannot perform his

former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV. DISCUSSION

Following the five step evaluation process, ALJ Musseman found that plaintiff has not engaged in any substantial gainful activity since March 1, 2007, the alleged onset of her disability.  (Tr. 14-15; see 20 C.F.R. § 404.1520(b) et seq.).  ALJ Musseman then concluded that the medical evidence supports a finding that the claimant has the following severe impairments: affective disorder and anxiety disorder. (Tr. 15-16; see 20 C.F.R. § 404.1520(c)). In the third step of the evaluation process, the ALJ concluded that, prior to July 18, 2008, plaintiff's severe impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 16-18).  In addition, at step four, ALJ Musseman found that prior to July 18, 2008, the date that plaintiff became disabled, she had the residual functional capacity to perform a full range of work at all exertional levels but with a limitation to unskilled work.  (Tr. 18-21).  According to the ALJ, he gave little weight to the opinion of Dr. Deackoff, to the GAF rating of 45 in February and April 2008, and to the opinion of DSS in finding plaintiff disabled. (Tr. 20-21).  ALJ Musseman concluded that prior to July 18, 2008, while plaintiff was unable to perform past relevant work, she retained the RFC to perform work in the national economy, and thus plaintiff was not disabled prior to July 18, 2008, but became disabled on that date and has continued to be disabled through the date of this decision.  (Tr. 21-25).

As stated above, plaintiff initially filed a Motion for Order Reversing the Decision of the Commissioner, in which she asserted that the ALJ erred in setting the onset date of July 18, 2008 rather than March 1, 2007; the ALJ erred in his credibility assessments; the ALJ erred in finding that all of plaintiff's medically documented physical impairments were non-severe; the ALJ erred in failing to elicit testimony from the vocational expert; and the

ALJ failed to address plaintiff's claim of disability under Listing 12.08. (See Dkt. #10). Thereafter, defendant filed his Motion for Entry of Judgment and Remand[31] in which defendant asserts that upon remand, the Decision Review Board will assign this case to an ALJ with instructions to obtain Medical Expert input on the issue of plaintiff's onset date and, if warranted, to further consider plaintiff's residual functional capacity for the period prior to July 18, 2008.  (See Dkt. #14, Brief, at 1).  Plaintiff objected to a remand of this matter on grounds that there is "no paucity of medical evidence" before the ALJ regarding the severity of plaintiff's symptoms as of the alleged onset date, there is no ambiguity that would require the testimony of a medical expert, and a remand will only result in additional delay.  (See Dkts. ##15-16, at 1).  Defendant responded by asserting that the record "does not necessarily support a finding that [p]laintiff has been disabled since her alleged onset date of March 1, 2007[,]" as plaintiff expressed an interest in returning to work in February 2007, she worked in the last quarter of 2007, and in November 2007, plaintiff noted she is capable of driving a vehicle, caring for herself and caring for her home.  (See Dkt. #17, at 1-2).

In addition to making a determination of disability, an ALJ must determine a claimant's onset date of disability, which date affects the period for which the individual may be eligible for benefits.  SSR 83-20, 1983 WL 31249, at *1 (S.S.A. 1983).   The March 1, 2007 date alleged by plaintiff should be used if it is "consistent with all the evidence available."   Id. at *3.  "When the medical or work evidence is not consistent with the allegation," as defendant contends in this case, then "additional development may be needed to reconcile the discrepancy.  However, the established onset date must be fixed

_____

[31]See note 4 supra.

based on the facts and can never be inconsistent with the medical evidence of record."

Id.

While defendant emphasizes that plaintiff's earning records demonstrate that she worked through the last quarter of 2007, those records reveal that plaintiff earned $507.00 during that last quarter.  (Tr. 141).   Plaintiff's earnings record is consistent with her statement that she "attempted to work at the beginning of November [2007]," for about six weeks, but she was absent from work "about [fifteen] times so she was laid off."  (Tr. 175).

Furthermore, while defendant contends that plaintiff wanted to return to work in February 2007, defendant cites an August 9, 2007 entry made by Carole Montano at CRMHC.  (Tr. 216).  The error in the date notwithstanding, there are entries in the record on April 9 and August 9, 2007 of plaintiff expressing an interest in obtaining employment, because she had no money to support herself.  (See Tr. 216, 247, 287, 297, 499, 924). On the two dates that she expressed this interest, her medical records reveal that plaintiff had a "[m]oderate impairment" in psychiatric functioning (see Tr. 287-89), and plaintiff was "dysphoric and tearful," and was suffering from increased worry and difficulty falling asleep.  (Tr. 216-17, 247-48, 298-99, 499-50, 924-25).  Additionally, in the time period between April 9, 2007 and August 9, 2007, plaintiff reported to CRMHC with "tearfulness, sobbing, c[omplaints] o[f] depression w[ith] suicidal ideation," and explicit thoughts of overdosing on heroin. (Tr. 253).  She had "generalized body aches, anhedonia, and anergia . . . . She has been unable to work in several months and ha[d] been chronically anxious and most recently depressed w[ith] suicidal ideation."  (Tr. 253-54).   On May 3, 2007, plaintiff was treated at the emergency department of Hartford Hospital with suicidal thoughts and plans to overdose on heroin (Tr. 350-53, 370-72, 392, 754-56), and she was

admitted to IOL.  (See Tr. 353, 374-91; see also Tr. 757-76).   Medical records reveal that plaintiff was "anergic, anhedonic, [and] tearful" with suicidal ideations: plaintiff described a plan to overdose on heroin, noting "that's the best way to go."  (Tr. 375, 758).[32]  Plaintiff's mood was "not good," and her affect was "[s]ad, depressed, [and] tearful."  (Tr. 380, 763).   She was diagnosed with major depressive disorder, severe, recurrent, without psychotic features, and polysubstance dependence, in remission.  (Tr. 382, 765).   The medical records for the time period at issue, coupled with the extensive medical records reflecting consistent treatment from 2007 up to and including July 2008 and beyond, see Section II. supra, do not reflect an "administrative record [that is] unclear as to the date [p]laintiff's disability began."  (See Dkt. #17, at 2).

In addition, while defendant points to a single entry on November 15, 2007, wherein it is noted that plaintiff is capable of driving a vehicle, caring for herself, and caring for her home (Tr. 323), which entry is inconsistent with other entries evidencing plaintiff's inability to drive (see Tr. 431-32, 532, 664-65, 703-04), and her reports that she does not prepare her own meals, shop, or do household chores (Tr. 179-81, 433, 666, 705), and yet consistent with entries reflecting only mild impairment in basic activities of daily living (see Tr. 288, 303-06, 317), plaintiff's established onset date can "never be inconsistent with the medical evidence of the record."   SSR 83-20, at *3.   As recited thoroughly in Section II. supra, the medical evidence of record reveals that in 2007, plaintiff had "credible" allegations of depression (Tr. 305), moderate limitations in the ability to understand, remember and carry out detailed instructions, maintain concentration for extended periods, complete a normal workday and workweek without

---

[32]See notes 12 & 30 supra.

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to set realistic goals or make plans independently of others  (Tr. 303-04), moderate limitations in her ability to maintain concentration, persistence or pace (Tr. 317), and consistent tearfulness and lack of concentration (see Tr. 202, 216, 247, 253, 266-67, 298, 420, 486-87, 499, 908, 913-15, 924).  Additionally, plaintiff appeared for a medical appointment "poorly groomed, with messy hair and wrinkled clothing" (Tr. 477, 904), and as of the end of 2007, was homeless and living in deplorable conditions.  (See Tr. 420).

Plaintiff's medical evidence and work history is not inconsistent with her March 1, 2007 onset date of disability, and as discussed above, there are no discrepancies in the record that need to be reconciled.  Accordingly, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #9)[33] is granted.

### V. CONCLUSION

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #9) is granted; defendant's Assented to Motion for Entry of Judgment (Dkt. #13) is denied as moot; and defendant's Amended Motion for Entry of Judgment and Remand of the Matter to the Commissioner of Social Security (Dkt. #14) is denied.

The parties are free to seek the district judge's review of this recommended ruling.  See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 72.2 of the

---

[33]See 42 U.S.C. § 405(g)("The court shall have power to enter . . . , a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."); Rosa v. Callahan, 168 F.3d 72, 83 (1999)(footnote & citation omitted)("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.").  The Court exercises its power to remand solely for the calculation of benefits due to plaintiff.

Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated this 8th day of July, 2010 at New Haven, Connecticut.


  /s/ Joan G. Margolis, USMJ  
Joan Glazer Margolis
United States Magistrate Judge